UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERIJET INTERNATIONAL, INC.,
2800 South Andrews Avenue,
Fort Lauderdale, FL 33316,

      Plaintiff,

v.                                    CASE NO. _____

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, Washington, D.C.
20528, TRANSPORTATION SECURITY
ADMINISTRATION, 601 S. 12th Street,
Arlington, VA 20598, and JOHN S. PISTOLE,
in his official capacity as Administrator of the
TRANSPORTATION SECURITY
ADMINISTRATION, 601 S. 12th Street,
Arlington, VA 20598,

      Defendants.
_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

      AMERIJET INTERNATIONAL, INC. ("Amerijet"), Plaintiff herein, seeks declaratory and injunctive relief against Defendants UNITED STATES DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION, and JOHN S. PISTOLE in his official capacity as Administrator of the Transportation Security Administration (collectively herein "Defendants" or "TSA"), as follows.

### Nature of the Action

      1.      This is an action brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Fifth Amendment to the United States Constitution and the Declaratory Judgment Act, 28 U.S.C. § 2201, for declaratory and injunctive relief to remedy Defendants' pattern and practice of ultra vires conduct in excess of statutory authority and in deprivation of Amerijet's procedural and substantive due process rights.

1

2.      As Justice Breyer has remarked, "There is no United States Supreme Court of the World."[1] So, too, there is no Transportation Security Administration of the World.  In an effort to regulate the internal security measures of foreign sovereign nations, TSA has engaged and continues to engage as of the bringing of this action in a pattern and practice of threatening to disrupt trade and cause economic and business harm to Amerijet and the foreign sovereign nations to which it provides vital transportation services, for the unlawful objective of coercing putative "consent" from such foreign nations to TSA oversight and regulation of their security measures and programs.  This pattern and practice by TSA is in excess of TSA's statutory authority, is otherwise contrary to law, and violates Amerijet's 5th Amendment constitutional rights.

3.      To redress irreparable harm to its rights, Plaintiff seeks declaratory and injunctive relief.

## Parties

4.      Plaintiff Amerijet International, Inc. is an airline incorporated under the laws of the State of Florida.  It is an air carrier certificated pursuant to 14 C.F.R. Part 121, and regulated as pertinent to this action by the Transportation Security Administration of the U.S. Department of Homeland Security. Amerijet's corporate office is located in Fort Lauderdale, Florida, and its airport operations are based at Miami International Airport.

5.      Defendant United States Department of Homeland Security ("DHS") is a federal executive department. It is the governmental body which oversees the Transportation Security Administration and has authority over TSA policies, procedures, and practices relating to all-cargo aircraft operator security measures, including those challenged in this lawsuit. DHS resides in the District of Columbia and may be found throughout the United States.

---

[1] *Kiobel v Royal Dutch*, U.S. Supreme Court case no. 10-1492, Oral Argument Transcript at p. 23 (February 28, 2012).

6.      Defendant Transportation Security Administration is a federal agency within DHS responsible for administering and enforcing "TSA requirements" as defined in 49 C.F.R. § 1503.101(b), as to those provisions of title 49 U.S.C. administered by the TSA Administrator and as to those regulations prescribed or orders issued under any of those statutory provisions, including 49 U.S.C. § 114 and 49 U.S.C. § 44901. Its headquarters is located in Arlington, Virginia and it may be found throughout the country.

7.      Defendant John S. Pistole is the Administrator of the Transportation Security Administration, headquartered in Arlington, Virginia. As the TSA Administrator, Mr. Pistole has overall responsibility for all aspects of the operation of the TSA, including authority over the TSA policies, procedures, and practices challenged in this lawsuit. Defendant Pistole is sued in his official capacity.

### **Jurisdiction and Venue**

8.      This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the action arises under the U.S. Constitution and the Administrative Procedure Act.

9.      Venue is appropriately vested in this Court pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(e), as the District of Columbia is a judicial district in which at least one defendant resides, and because a substantial part of the acts or omissions giving rise to the claims herein occurred in the District of Columbia.

10.     The United States, including its departments and agencies, is not immune to suit for actions arising under the U.S. Constitution and the APA.

11.     This is not an action for review of an administrative order or to affirm, amend, modify, or set aside any part of an order, and therefore the statutory procedure prescribing direct and exclusive review in the court of appeals of certain administrative orders of DHS or TSA under

49 U.S.C. § 46110 does not apply.   Instead this action constitutes a broad challenge to the unconstitutional, unlawful and ultra vires practices or procedures employed by the Defendants.

12.     Amerijet's claims in this action are not inescapably intertwined with issues pending in any administrative proceeding dealing with TSA's proof of alleged violations of TSA requirements, and therefore the district court is not precluded on that basis from hearing the claims asserted in this action because these claims must be heard by the court of appeals on direct review.

13.     Amerijet's claims are outside the agency expertise of any of the Defendants.

14.     This Court has jurisdiction over Plaintiff's claims herein because a finding of preclusion would foreclose all meaningful judicial review.

### General Allegations

**A.      The Applicable Statutory and Regulatory Framework**

15.     The Aviation and Transportation Security Act ("ATSA") provides that "[a] system must be in operation to screen, inspect, or otherwise ensure the security of all cargo that is to be transported in all-cargo aircraft in air transportation…."   49 U.S.C. § 44901(f). The term "air transportation" is defined in 49 U.S.C. § 40102(a)(5) to mean "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft."

16.     Unlike cargo transported on passenger aircraft, Congress has specifically provided and TSA has publicly acknowledged that cargo transported on all-cargo aircraft need not be subjected to direct physical screening so long as there is a system to reasonably ensure the security of that cargo.

17.     In implementing the directive in ATSA, DHS and TSA have publicly noted that they are utilizing a "risk-based" and "layered" approach, consistent with the DHS-developed "National Strategy for Global Supply Chain Security" announced in January of 2012 "to promote the efficient and secure movement of goods".   In keeping with this strategy, DHS and TSA have publicly stated

that full direct physical screening by an all-cargo aircraft operator is mandated as to some cargo, however certain exemptions have been created from full direct physical screening for other cargo. Whether full direct physical screening is required or instead an exemption from full direct physical screening applies is dictated by criteria set out in each aircraft operator's TSA-approved security program as supplemented by TSA security directives and any "alternate procedures" granted by TSA to those security directives.

18.     This publicly-announced DHS and TSA national strategy is consistent with other public statements by DHS and TSA regarding the infeasibility of full direct physical screening of all cargo to be transported by air.  For example, in the publicly-available version of a 2007 DHS Inspector General Report, DHS noted that given the high volume of cargo that must be expeditiously processed and loaded on aircraft, experts generally agree that full direct physical screening of all air cargo is not feasible with available screening technologies and procedures.

19.     In addition, DHS and TSA have publicly acknowledged that certain types of air cargo pose challenges for physical screening, and thus have suggested publicly the need for alternative means of ensuring the security of this cargo other than by full direct physical screening of the cargo.  DHS and TSA specifically and publicly on more than one occasion have identified perishable products, human remains, pharmaceutical products, and electronics and high value items in sealed or sophisticated protective packaging as among the types of air cargo presenting such challenges.[2]

---

[2] Amerijet is mindful of the obligation under 49 C.F.R. Part 1520 to avoid disclosure of "Sensitive Security Information" or "SSI", consisting of information obtained or developed in the conduct of security activities, the disclosure of which, *inter alia*, DHS and/or TSA has determined would be detrimental to the security of transportation. Because the information regarding cargo presenting screening challenges, DHS's and TSA's risk-based, layered approach to ensuring the security of cargo, and TSA's acknowledgment that ATSA does not require and TSA does not intend for 100% full direct physical screening of cargo to be transported on all-cargo aircraft but is to be determined based upon a risk-based approach incorporated into TSA-approved FACAOSSPs and security

20.     More specifically, DHS and the TSA Administrator are authorized by statute at 49 U.S.C. § 114(l) and (v) to issue and enforce regulations and "security directives" to implement security measures to carry out the duties and responsibilities delegated by Congress, necessarily including the mandate of ATSA regarding "cargo that is to be transported in all-cargo aircraft in air transportation."

21.     TSA regulations in turn principally implement the ATSA mandate concerning security of cargo to be transported in all-cargo aircraft, through a TSA-approved security program at each all-cargo aircraft operator known as a "Full All Cargo Aircraft Operator Standard Security Program" or "FACAOSSP".  FACAOSSP programs are provided for by regulation in 49 C.F.R. §§ 1544.101, 1544.103, and 1544.105.

22.     TSA by regulation at 49 C.F.R. § 1544.305(a) has implemented the provision of 49 U.S.C. § 114(l) regarding security directives, by providing for TSA to issue "a Security Directive setting forth mandatory measures" for aircraft operators "[w]hen TSA determines that additional security measures are necessary to respond to a threat assessment or to a specific threat against civil aviation".

23.     In May of 2011, TSA issued a security directive, number SD 1544-11-04, on "Cargo Security Measures – All-Cargo Aircraft", applicable to all-cargo aircraft operators transporting cargo into the United States.  As reflected in public statements by DHS and TSA officials, the security directive was issued on an emergency basis as a result of an incident in Yemen in October of 2010 in

---

directives is all information shared by DHS and TSA officials in presentations to trade and industry associations, in congressional testimony readily available on the internet, and on agency official websites, such information cannot constitute SSI.

which terrorists were determined to have concealed explosives in cargo on all-cargo aircraft bound for the United States.[3]

24.     Security directive 1544-11-04 was effective May 27, 2011 and superseded Security Directive 1544-10-04 that issued immediately following the Yemen incident.  Security Directive 1544-11-04 was canceled and superseded on May 27, 2012 by SD 1544-11-04A, which in turn was canceled and superseded on May 27, 2013 by SD 1544-11-04B.  SD 1544-11-04B expires on May 27, 2014.  Other than the effective dates, each of the security directives in the 1544-11-04 series is identical and thus the security directive on "Cargo Security Measures – All-Cargo Aircraft" now in place is unchanged from the security directive as initially issued and effective May 27, 2011.

25.     As of early 2012, the air cargo security measures in place, necessarily including those contained in the Security Directive 1544-11-04 series, continued to incorporate the risk-based, layered approach articulated by DHS as well as TSA, and generally did not require full direct physical

---

[33] 49 U.S.C. § 114 (l)(2) sets out "[e]mergency procedures" for issuance of a security directive immediately "in order to protect transportation security … without providing notice or an opportunity for comment and without prior approval of the Secretary"; however any security directive issued on an emergency basis "shall be subject to review by the Transportation Security Oversight Board established under" 49 U.S.C. § 115 and any such security directive "shall remain effective for a period not to exceed 90 days unless ratified or disapproved by the Board or rescinded by the Under Secretary."  Each of the security directives in the 1544-11-04 series was issued on an emergency basis, without providing notice or an opportunity for comment and without prior approval of the Secretary.  Whether the Transportation Security Oversight Board engaged in its watchdog function with respect to each of these three security directives, and whether each was ratified within 30 days as provided for in 49 U.S.C. § 115, is beyond the scope of this action.  However Amerijet is reminded of Justice Jackson's cautionary remarks that the nation's forefathers, other than provision for the suspension of the writ of habeas corpus, "made no express provision for exercise of extraordinary authority because of a crisis," as they "knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation", and "[w]e may also suspect that they suspected that emergency powers would tend to kindle emergencies." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring).  Amerijet would note that TSA by invocation of "emergency procedures", even two and a half years after the Yemen incident first kindled an emergency, in connection with the most recent renewal of the security directive has managed to bypass public notice and an opportunity for comment on the security directive for a third time.

screening of all cargo inbound to the United States being transported by all-cargo aircraft operators.[4] TSA security measures for inbound cargo on all-cargo aircraft thus continued as of htat time and at the present time to provide several risk-based exclusions from full direct physical screening of cargo where the criteria for such exclusions set out in the aircraft operator's FACAOSSP and the Security Directive 1544-11-04 series are satisfied.

## B.    The Business and Operations of Amerijet

26.    Amerijet is a small all-cargo airline based in Miami, Florida.  Amerijet has been acknowledged by TSA to be a "small business concern" according to U.S. Small Business Administration standards.

27.    Amerijet is engaged in the transportation of cargo between the United States and various locations in the Caribbean and Latin America.

28.    For many of the locations Amerijet serves, it provides the only regular cargo service to or from the location, and thus its transportation services are vital to the local economy and provide the only reliable access to outside markets by air for the country.  By way of example, Amerijet provides the only jet service – passenger or cargo – to the Commonwealth of Dominica.  It provides the only regular cargo service to many of the other countries in the Caribbean Community, including St. Kitts, Grenada, St. Vincent, Haiti, Barbados, Aruba, and Antigua.  Following the devastating earthquake in Haiti, Amerijet was the first aircraft to fly into Haiti.  Amerijet's connection to, and respect for and commitment to continue to serve, these communities is deep and longstanding.

29.    Amerijet carries a wide variety of articles to the foreign locations it serves, including general cargo but also oversized and heavy equipment, perishables, live animals (such as hatchlings

---

[4] This information is contained in a publicly-available TSA presentation from early 2012 on "TSA's Risk-Based Approach for International Inbound Cargo" and thus is not SSI.

and chicks), dangerous goods/hazardous materials (for construction and other projects), and perishables.  Cargo which Amerijet transports from these countries into the United States consists of some general cargo, but for many locations is mostly made up of perishables (including fruits and vegetables, fish and other seafood, and flowers) destined for market in the United States.  Amerijet also is a frequent provider of transportation to the pharmaceutical and electronic industries, and regularly transports human remains (including fallen law enforcement and military personnel as well as private persons) to the United States.

30.      Amerijet operates in accordance with a TSA-approved FACAOSSP. It is also subject to the Security Directive 1544-11-04 series.

**C.      Amerijet's Compliance with TSA Requirements in the Transport of Inbound Cargo**

31.      Following the Yemen incident and TSA's issuance of Security Directive 1544-11-04, after careful study of the facts and security directive 1544-11-04, Amerijet determined that it could meet TSA requirements without full direct physical screening of all inbound cargo, because in substantial part cargo transported by Amerijet met the clear and unambiguous criteria for exemption from full direct physical screening under one or more of the exemptions contained in the security directive and in Amerijet's FACAOSSP.

32.      Amerijet did request, and received from TSA in July of 2011, two "alternate procedures" to Security Directive 1544-11-04 concerning certain provisions of that security directive.[5] TSA regulations provide for submission and approval of alternate procedures to security directives under 49 C.F.R. § 1544.305(d), which states: "[i]n the event that the aircraft operator is unable to implement the measures in the Security Directive, the aircraft operator must submit

---

[5] The alternate procedures are not identified further here in an abundance of caution, to avoid disclosure of information that may be deemed by TSA to be SSI.

proposed alternative measures and the basis for submitting the alternative measures to TSA for approval."

33.     The substance of each of these alternate procedures granted Amerijet by TSA in July of 2011 is not pertinent to the issues raised in this action.  However upon information and belief, the same or substantially similar alternate procedures were granted by TSA to other all-cargo carriers on or about the same date.[6]

34.     Following a TSA inspection in late 2011 in one of the small Caribbean countries served by Amerijet, TSA issued a "letter of investigation" or "LOI", questioning Amerijet's compliance with TSA requirements, including compliance with the security directive, in that location inspected.

35.     By letter of February 2, 2012, Amerijet submitted to TSA a lengthy and carefully-considered response, spelling out in detail Amerijet's understanding of how it was complying with the security directive in the location at issue.  Specifically, Amerijet explained how it understood that the criteria for exclusion from full direct physical screening were satisfied with respect to the cargo at issue in the inspection, and thus there was no violation of TSA requirements.

36.     Amerijet concluded its submission by noting that Amerijet had a vested interest in securing the United States, and by requesting the opportunity to continue to discuss and maintain an open dialog with TSA on the compliance issues raised in the LOI, not only because of Amerijet's interests and the important security interests involved, but out of consideration for the small

---

[6]Although Amerijet has formally requested from TSA information regarding these and any other alternate procedures granted, rejected, deferred or modified to security directive SD 1544-11-04 for any other aircraft operator at the locations served by Amerijet, TSA has objected to Amerijet's request and has refused to provide such information, in part on the grounds that such alternate procedures are granted by TSA in its discretion as it may determine appropriate given the facts and circumstances of each request, and because such information is SSI, and Amerijet has no need to know that information.

Caribbean nations who depended upon Amerijet: "We hold a niche market, serving many nations for over 40 years that would otherwise have no way to bring their perishable products to market."

37.     Amerijet never received a response from TSA to its February 2012 correspondence. In particular, Amerijet was never advised by TSA throughout the investigation process that Amerijet's understanding of the applicable TSA requirements and its understanding that it was in full compliance with applicable TSA requirements as set out in Amerijet's February 2012 correspondence was in any way misguided or erroneous.

38.     Shortly after TSA received Amerijet's correspondence setting forth its good faith belief that it was in compliance with the security directive and other TSA requirements, including as to perishables cargo which TSA had itself recognized as "challenging" for full direct physical screening, TSA conducted inspections in March and April of 2012 at two other Caribbean locations served by Amerijet, countries that, as with the first country inspected, are members of the Caribbean Community/CARICOM and the Organisation of Eastern Caribbean States ("OECS") and from which Amerijet transports perishables and other cargo identified by TSA as presenting challenges making for full direct physical screening potentially infeasible.

39.     Amerijet received a "letter of investigation" from TSA following each inspection, to which it responded by again pointing out that it believed it had not committed any violation but instead was in compliance with all requirements, and in particular that the cargo at issue was exempt from full direct physical screening because the criteria for exemption set out in the security directive were satisfied in each case.

40.     Amerijet further noted, however, that if TSA after consideration of Amerijet's response should have questions or seek additional information regarding the inspection or Amerijet's compliance with TSA requirements, to please contact Amerijet, as "Amerijet takes its

security responsibilities very seriously, and we wish to respond fully to any concerns that TSA may have."

41.     TSA's answer to Amerijet's response to the "letter of investigation" correspondence in each case was a "letter of correction" pursuant to 49 C.F.R. § 1503.301, in which TSA made a final determination that Amerijet was in violation of TSA requirements.  The letter of correction contained no explanation as to why Amerijet was deemed by TSA to have violated TSA requirements, however, and in particular as to why the specific cargo at issue in each inspection was not exempt from full direct physical screening by the applicable exemption provisions of the security directive that Amerijet had pointed to in its response to each of the letters of investigation.

42.     As expressly noted in each letter of correction, by regulation a letter of correction "confirms" TSA's decision that a violation has been found, but the issuance of letter of correction nonetheless is not appealable under TSA's investigation and enforcement procedures in 49 C.F.R. Part 1503.

43.     Letters of correction serve as aggravating factors in connection with any future civil penalty proceeding, and these letters of correction therefore are expressly noted by TSA in subsequent investigation reports recommending a determination of TSA violation by Amerijet and civil penalties against Amerijet.  The letters of correction thus cause imminent harm to Amerijet by forming the basis for aggravated penalties in pending enforcement proceedings.

44.     After these letters of correction from TSA, in November of 2012 Amerijet received from TSA a "Notice of Proposed Civil Penalty" or "NPCP", pursuant to 49 C.F.R. § 1503.413, charging Amerijet with a violation of TSA security requirements, apparently due to Amerijet's failure to conduct full direct physical screening of the cargo at issue in TSA's late 2011 inspection.  In an "informal conference" with TSA field counsel as provided for in 49 C.F.R. § 1503.413(c)(2) and in subsequent communications in December of 2012 with field counsel, Amerijet was informed for the

first time that TSA did not consider Amerijet eligible for the exemptions from full direct physical screening of all cargo covered by security directive 1544-11-04, even though the criteria for the exemptions set out in the security directive were satisfied, because the Caribbean country at issue did not have a security program "recognized" and approved by TSA.[7]  Stated differently, according to TSA's position as clearly communicated to TSA in the informal conference conducted pursuant to regulatory requirements in December of 2012, if TSA did not formally recognize and approve the country's security "program" or processes, all cargo to be transported from the country to the United States must be fully screened through direct physical screening even though the criteria for exemption from full direct physical screening set out in the security directive were satisfied.

45.     This putative condition or prerequisite to exclusion of any cargo from full direct physical screening is not contained in the security directive. Amerijet therefore inquired of TSA as to where this prerequisite could be found in any notice of this requirement provided to Amerijet and other entities regulated under the security directive. Amerijet was informed by TSA that this purported condition or prerequisite did not exist in writing.  Indeed TSA has not promulgated or issued any written interpretation, guideline, or policy concerning prerequisites or conditions to application of the exemptions from full direct physical screening of cargo contained in security directive 1544-11-04 and at issue with respect to Amerijet.

46.     Amerijet next inquired as to how a country might obtain recognition or approval of its "security program" by TSA, and was informed by TSA field counsel that this was accomplished

---

[7] This putative condition or prerequisite to utilizing the exclusion provisions of the security directive is not SSI, as TSA has expressly repudiated that any such condition or prerequisite exists or existed, as noted below, and thus the prerequisite cannot be information the disclosure of which would be detrimental to the security of transportation.  In addition, 49 U.S.C. § 114(r)(4) provides that no provision of law "shall be construed to authorize the designation of information as sensitive security information…(A) to conceal a violation of law, inefficiency, or administrative error; [or] (B) to prevent embarrassment to a person, organization, or agency", each limitation reasonably appearing to apply to the putative TSA "requirement" that has now been repudiated.

through the country's participation to TSA's satisfaction in TSA's "National Cargo Recognition Program" or "NCRP". Amerijet asked TSA which countries served by Amerijet had a security program which had been "recognized" by TSA or were participating in the NCRP working toward such recognition, so that Amerijet could know which of the countries it served might qualify under this unwritten prerequisite to the exemption from full direct physical screening of all cargo. Amerijet was told by TSA that this information was confidential and could not be shared with Amerijet.

47.      Denied any information from TSA, Amerijet attempted as best it could to research TSA's National Cargo Recognition Program so that it could be educated as to this unwritten condition TSA had placed on exemptions from full direct physical screening of all cargo.[8] From what Amerijet was able to discover through publicly-available information, the NCRP appears to be a program in which for the most part only Western Europe has elected to participate. Other than a handful of countries, all the remaining countries in the world outside of Western Europe have elected not to participate in TSA's recognition program, including the entirety of the Caribbean and Latin America, the countries served by Amerijet.[9]

48.      According to TSA's publicly-articulated "recognition" process for evaluating a foreign sovereign's security program under the NCRP, to be considered for TSA "recognition" a country must provide full program information and documentation to TSA, allow TSA to review

---

[8] It appears this program has alternatively been referred to in TSA presentations to trade groups and to Congress as TSA's "National Country Recognition Program". Under either name, because information regarding the specifics of the program and TSA's evaluation process under the program is no longer available on TSA's website, it is not clear what the program currently entails or even if it is a viable continuing program at TSA.

[9] That TSA has previously stated publicly that recognition agreements will be communicated to affected regulated entities, including air carriers, and yet no recognition agreement has been communicated to Amerijet by TSA regarding any country served by Amerijet, further reinforces Amerijet's understanding that no country it serves has received TSA "recognition" of its security program.

and evaluate the country's program, conduct site visits and observe the implementation of the program at facilities of participants in all aspects of the air cargo security program, and allow ongoing oversight and reevaluation by TSA for possible renewal (or not) of the recognition at set intervals.

49.     In sum, in order to obtain recognition by TSA of a country's security program under TSA's NCRP, the foreign sovereign must consent to TSA jurisdiction, oversight, and regulation of the country's security measures.  As noted above, only Western Europe, which by virtue of its apparently collective negotiation may have obtained reciprocal benefits in a "recognition" agreement under the NCSP, has seen fit to participate with TSA in a process that appears to violate principles of comity and to require consent to extraterritorial application of U.S. law in foreign sovereign nations.

50.     TSA has publicly described its "Aviation Security Sustainable International Standards Team" or "ASSIST" program, by which TSA offers technical assistance, aviation security training, and/or security assessments, including security program assistance, to other countries.  Because it became clear from Amerijet's research that none of the countries served by Amerijet have security programs "recognized" by TSA, Amerijet formally inquired of TSA as to whether it had been in communication with any Caribbean Community/CARICOM country, or with the OECS or its civil aviation authority, the Eastern Caribbean Civil Aviation Authority ("ECCAA"), or with any OECS member country, regarding the ASSIST program or regarding providing other TSA assistance in developing or implementing a security program which is consistent with what TSA would require for "recognition" of a country's security program outside of the NCSP process.  TSA objected to providing and did not provide the information.

51.     On information and belief, TSA has not extended any assistance to any OECS country, or any CARICOM country, or to the ECCAA, or to any country served by Amerijet, under

the ASSIST program or otherwise, offering to collaborate with or assist that country with its security measures outside the NCRP.

52.     Amerijet clearly communicated to TSA, and TSA has observed and confirmed by its inspections, that full direct physical screening of cargo in accordance with TSA-approved screening methods, including perishables and also pharmaceuticals and other sealed cargo, is not feasible for economic and practical reasons at many of the locations served by Amerijet.  Amerijet has established that infeasibility in writing to TSA, and has offered to supplement and augment its submissions if there is any doubt on the part of TSA that full direct physical screening of cargo is infeasible at the locations at issue.

53.     TSA instead has accepted the foundational premise that full direct physical screening of all cargo by Amerijet at certain of the locations it serves is not possible, and therefore for TSA to compel such screening in the guise of an unwritten and non-existent TSA "requirement" would put Amerijet at risk of substantial penalties for violation of such a putative TSA requirement, or would require Amerijet to terminate its service to the locations at issue which in turn could put Amerijet out of business.

54.     Given the infeasibility of full direct physical screening of cargo by Amerijet in accordance with TSA-approved screening methods at locations where the national authorities of the country at issue apparently had not agreed to cede jurisdiction, oversight and regulation of their security programs to TSA, TSA by its field counsel and also Amerijet's principal security specialist, solicited Amerijet in December of 2012 to apply for "alternate procedures" to avoid enforcement proceedings and the risk of civil penalties inherent in such proceedings.

55.     Without waiving its objection to the unwritten requirement that exemptions in the security directive 1544-11-04 from full direct physical screening of all cargo were only available in countries that had TSA "recognized' security programs, Amerijet submitted to TSA in early

16

February of 2013, after careful research and preparation, a detailed application for alternate procedures consistent with TSA's invitation.

56.     The application proposed several alternatives to satisfy the unwritten and non-existent requirement that a country have a TSA-approved security program before exemptions to full direct physical screening of all cargo in the security directive could provide relief from full direct physical screening of all cargo.  The application also proposed several alternatives addressed to the cargo TSA had already conceded to be "challenging" and ill-suited to full direct physical screening – including perishables and human remains, but also pharmaceuticals and other cargo in sealed or protective packaging that would be compromised by full direct physical screening according to TSA-approved screening methods.

57.     Following a conference with TSA regarding the application, and TSA's request for supplementation and clarification of Amerijet's application, Amerijet made an even more detailed follow up submission in support of its alternate procedures.  TSA denied Amerijet's application for alternate procedures in its entirety and without explanation in May of 2013.

58.     During the time the application for alternate procedures was pending, TSA engaged in a "full court press" on many of the small countries served by Amerijet in both the Caribbean and Latin America.  TSA conducted inspection after inspection, always finding that Amerijet was in violation of TSA requirements.

59.     Based upon the information previously provided to Amerijet, it reasonably appeared that in each case, the finding of a violation as communicated to Amerijet, to its foreign agents, and to the national civil aviation authorities of the country involved, was predicated upon the fact that TSA would not permit anything less than full direct physical screening of all cargo to be transported by Amerijet because the country involved had not conceded to TSA authority to evaluate the

country's security program, and to oversee and police the implementation of such a program consistent with TSA's own parameters.

60.     Upon information and belief, Amerijet's foreign agents and the foreign national authorities, directly or indirectly, were informed of the prospect of substantial civil penalties against Amerijet for violations of TSA requirements or the alternative of the termination of Amerijet's services to the country due to the lack of consent of the national authorities to TSA jurisdiction over the security programs of the country.

61.     In each case Amerijet received a letter of investigation, alleging an unspecified violation of TSA requirements, to which Amerijet responded that it had a confident and good faith belief that it was in full compliance with the security directive through certain exemptions clearly applicable and as previously explained in detail to TSA; however Amerijet further responded that it had also submitted an application for alternate procedures at the express invitation of TSA that would address and resolve the unstated grounds for the alleged violation of TSA requirements.

62.     Given the absence of any written interpretation, guidance, or policy supporting TSA's contention that Amerijet was in violation of TSA requirements, and yet TSA's continued issuance of letters of investigation contending Amerijet was indeed in violation of TSA requirements without any stated reason or explanation, in April of 2013 Amerijet availed itself of the only other avenue it could find to ascertain the legal and factual basis for TSA's allegation that it was in violation of TSA requirements solely because countries it served had not consented to TSA jurisdiction and oversight of their security programs, a requirement nowhere found in the security directive or Amerijet's FACAOSSP.

63.     Specifically, Amerijet requested under 49 C.F.R. § 1503.415 a copy of the "Enforcement Investigation Report" or "EIR" for the investigations arising from the TSA inspections (at that time not one but two) in the country that formed the subject of TSA's original

LOI.  Under 49 C.F.R. § 1503.415(a), a person charged with a violation of TSA requirements may receive a copy of the non-privileged portions of the relevant enforcement investigation report on which the charges are based, for the express stated purpose of obtaining the information necessary to prepare a response to the TSA allegations contained in the Notice of Proposed Civil Penalty.

64.     After initially withholding the two enforcement investigative reports in their entirety on the basis of the deliberative process privilege (except for a few introductory sentences at the beginning of each report and a few headings), in late June of 2013 TSA elected to produce a less redacted version of each report.

65.     The less redacted versions still withheld all discussion and analysis of the basis for a recommended finding of violation, however, and most significantly continued to redact on deliberative process privilege grounds all citations to specific statutes, regulations, security directives, alternative procedures, or Amerijet's FACAOSSP that TSA alleged to have been violated by Amerijet, taking the position that Amerijet was not entitled to know and instead could not know what specific violations it was accused of by TSA and upon which TSA's Notice of Proposed Civil Penalty was expressly based in each case.

66.     When TSA subsequently issued additional Notices of Proposed Civil Penalty in the month or so prior to the bringing of this action, as discussed further below, on each occasion Amerijet requested a copy of the enforcement investigation report to which it is entitled under 49 C.F.R. §1503.415(a).  On each occasion TSA redacted from the report as produced to Amerijet any reference to any specific statute, regulation, security directive, alternative procedure, or Amerijet's FACAOSSP that TSA alleges to have been violated by Amerijet so as to form the basis for the Notice of Proposed Civil Penalty.

67.     As of the filing of this action, TSA has failed to inform Amerijet in any Notice of Proposed Civil Penalty, or in any underlying enforcement investigation report that forms the basis

for a Notice of Proposed Civil Penalty, of any specific TSA requirement – any statute, regulation, order, program provision, security directive, or alternate procedure to a security directive – that Amerijet has been determined after TSA investigation to have violated and thus which provides grounds for the initiation by TSA of an enforcement proceeding.

68.     At the end of May of 2013, shortly after TSA denied in its entirety Amerijet's TSA-solicited application for alternate procedures, Amerijet applied for an extension of its two existing alternate procedures for certain provisions of the security directive noted above.

69.     At that time TSA had not even initiated enforcement proceedings against Amerijet by issuance of a Notice of Proposed Civil Penalty, except as to the Caribbean location at issue in the initial inspection in late 2011.  All the other inspection locations remained in the investigative stage, with no decision yet rendered as to any possible violation of TSA requirements by Amerijet.

70.     Yet each of these investigations remained an open threat against Amerijet and the country at issue, as to whether Amerijet could continue to serve the TSA-targeted location so long as the national authorities in that country continued to withhold consent to TSA jurisdiction and oversight over its sovereign affairs.

71.     On July 17, 2013, TSA denied the extension of the two alternate procedures with respect to each of the locations where Amerijet had either received a Letter of Correction or had an open investigation.  This denial of the extensions of previously-granted benefits is a direct injury to Amerijet.

72.     At about the time TSA denied extensions of the alternate procedures at certain locations served by Amerijet, TSA reached out to Amerijet and for a second time solicited from Amerijet an application for alternate procedures to provide a means of addressing the issues in the various investigations and the one pending enforcement action outside TSA enforcement

proceedings.  Again specific alternative measures were discussed for inclusion in the application for alternate procedures.

73.     On August 9, 2013, Amerijet submitted its second application for alternate procedures solicited by TSA.  As of the filing of this action more than a month later, TSA has failed to grant the alternate procedure and has failed to issue a decision on the application.[10]

74.     In the meantime, as it did while Amerijet's first solicited alternate procedures request was pending before TSA for decision, TSA in August of 2013 engaged in another "full court press" of inspections.  The inspections were at the same locations that were the subject of TSA's inspections while Amerijet's first alternate procedures request was pending.  TSA has again met with Amerijet's agents in these locations, and the national authorities, and upon information and belief, in some cases with customers of Amerijet.

75.     Upon further information and belief, TSA has informed all of them that Amerijet continues to be in violation of TSA requirements at these locations, making Amerijet an "intransigent" and "evasive" violator that may well be subjected to harsh sanctions.

76.     In light of TSA's only stated basis in December of 2012 for why putative violations of TSA requirements were being asserted against Amerijet, it continues to be Amerijet's understanding that TSA has continued to communicate that these violations are based upon the various foreign countries failing to have a security program "recognized" by TSA.

---

[10] One court has suggested that where there is a pattern on the part of an agency to expressly solicit a submission from a regulated entity early in an agency investigation as a means of avoiding further enforcement proceedings, there are "serious fairness problems inherent in" the agency's conduct and a court "might very well conclude that it was an abuse of discretion" on the part of the agency if the agency did not issue the decision that it had invited a request for from the regulated entity and such conduct was not an isolated occurrence. *See Nat'l Distillers & Chem. Corp. v. DOE*, 498 F. Supp. 707, 721 (D.Del. 1980). Amerijet suggests that the circumstances that the court in that case surmised might well give rise to a conclusion that an agency has abused its discretion have occurred here.

77.     In particular, in late August of 2013 TSA made its third inspection of the location which was the subject of TSA's late 2011 inspection.  In that recent inspection, TSA met with the national authorities and, upon information and belief, informed those authorities that a security program that the authorities had previously accepted and approved from Amerijet's agent had not in fact been accepted and approved, because TSA had not reviewed or approved the country's process for doing so.  TSA did not offer any assistance to those national authorities, during that visit or at any other time from late 2011 to the present, in developing a security program that TSA would find acceptable.

78.     Over this same period -- from late July when TSA solicited another alternate procedure application from Amerijet until the end of August when TSA repudiated its position as discussed below -- TSA issued Notices of Proposed Civil Penalty in each of its previously open investigations.  None of the notices addressed why Amerijet was deemed by TSA not to be in compliance with the security directive based on its exemptions from full direct physical screening that clearly apply.

79.     Faced with the impossibility of compliance with the TSA's apparent directive that Amerijet must conduct full direct physical screening of all cargo, or alternatively pay assessed civil penalties based upon a non-existent TSA requirement, following issuance by TSA of a Final Notice of Proposed Civil Penalty and Order in connection with TSA's late 2011 inspection Amerijet made a timely request for formal hearing as permitted under TSA regulations.

80.     In its August 29, 2013 response to Amerijet's dispositive motion in that proceeding, TSA was finally forced to concede that indeed the putative requirement TSA had insisted upon, that a foreign sovereign nation must consent to TSA jurisdiction and obtain TSA "recognition" of its security program before any cargo covered by the security directive could be exempted from direct physical screening, did not in fact exist.

81.     Indeed, TSA not only repudiated any such "requirement", but insisted that TSA's statements in December of 2012 made at the regulatory "informal conference" to explain TSA's position -- in which TSA for the first and only time articulated to Amerijet this putative "requirement" and further explained that the failure of the country involved to meet this requirement formed the basis for TSA's determination that Amerijet was in turn in violation of TSA requirements by not conducting full direct physical screening of all cargo in that location -- were made in the context of settlement discussions and "should be inadmissible" in the enforcement proceeding.

82.     A week later, on September 5, 2013, TSA appeared to further confirm its concession that there is no requirement that TSA recognize a country's security program in order for exemptions in the security directive to full direct physical screening of cargo to be applicable in that country. In its September 5, 2013 filing, TSA stated that where there is no requirement in the security directive – identified by TSA as "the pertinent regulatory instrument" -- nor is there any mention of the requirement in the administrative complaint issued by TSA, the putative requirement is not "relevant" to the enforcement proceeding and cannot form the basis for discovery.

83.     In the two weeks since conceding that the putative "requirement" does not in fact exist that TSA must approve a country's security program before exemptions from full direct physical screening of cargo in the security directive may apply in that country, TSA has not closed its open investigations with a "no action" letter or otherwise.  Nor has TSA withdrawn its notices of proposed civil penalty.  Yet in every case, the determination of a violation of TSA requirements that formed the basis for the LOI and/or the NPCP appears to be based solely on the putative TSA requirement that TSA has now repudiated.

84.     In the same two weeks since TSA has conceded in a formal proceeding that this requirement does not exist, TSA inspectors have continued to insist that such a requirement does

indeed exist, and have continued to advise Amerijet's agents and the national authorities of the foreign countries where TSA has continued its intensified inspections of Amerijet operations in the Caribbean and Latin America, that Amerijet is in violation of TSA requirements because TSA has not approved or recognized the pertinent security programs of the country at issue and so Amerijet obligated to but is not conducting a full direct physical screening of all cargo in that country according to TSA-approved screening methods.

85.     Upon information and belief, TSA intends to continue its inspections of Amerijet operations in the Caribbean this week, and intends to continue to insist upon a country's submission to TSA approval and recognition of its security program as a condition to avoiding delay or disruption of service by Amerijet in that country due to the obligation to conduct full direct physical screening of all cargo.

86.     Over the period from December of 2011 to the present, upon information and belief Amerijet's competitors in several of the locations at issue have not been subjected to the same TSA scrutiny and pressure tactics, and instead have been permitted by TSA not to engage in full direct physical screening of all cargo.

87.     Upon further information and belief, TSA has allowed certain of Amerijet's competitors to conduct full direct physical screening of cargo only during a TSA inspection and has knowingly permitted such screening to be discontinued during times that TSA is not present.

88.     Amerijet reasonably believes that it is intentionally being subjected to disparate treatment by TSA from its competitors that are similarly situated to Amerijet in all relevant respects in the transport of cargo into the United States.

89.     Amerijet has been informed by TSA inspectors that certain of its competitors may have been granted relevant "alternate procedures" in countries that have not ceded to TSA the oversight and regulation of the country's security program.

90.     In response to Amerijet's formal request for any such alternate procedures granted to Amerijet's competitors in the locations served by Amerijet, TSA has objected and refused to provide the information.

**D.     Miscellaneous Allegations**

91.     Congress has not granted TSA statutory authority to implement and enforce security measures against foreign sovereign nations.  Therefore TSA lacks statutory authority to penalize foreign sovereign nations and U.S. aircraft operators alike for a foreign sovereign's non-compliance with TSA's preferred standards and processes, by withholding from a U.S. aircraft operator the benefit of the exemption from full direct physical screening of cargo security measures for air cargo plainly conferred in the security directive 1544-11-04 series where the criteria for exemption set forth in the security directive are clearly met.

92.     TSA's pattern and practice of interfering with the trade of a foreign sovereign nation, by imposing substantial burdens on that trade through the air cargo carrier intended to transport the goods from the sovereign nation to markets outside the country, is in excess of TSA's statutory authority and/or Constitutional authority.

93.     Alternatively, if TSA has such authority as a constitutional and statutory matter, TSA is constrained not to exercise it so as to offend international law, and its failure to do so is contrary to law.

94.     TSA can only investigate and enforce "TSA requirements" as defined in 49 C.F.R. § 1503.101.  TSA's unwritten position that foreign sovereigns must cede jurisdiction to TSA over their security programs in order for an entity subject to the security directive to obtain the benefit of the security directive exemption from full direct physical screening of all cargo is not a "TSA requirement" and cannot form the basis for TSA's pattern and practice of investigations and enforcement proceedings against Amerijet for violation of such a putative TSA requirement.

95.     TSA's insistence on a non-existent requirement in the course of investigations and in preliminary stages of enforcement proceedings, as a means of compelling an unlawful objective, and then repudiating that putative requirement before issuance of the administrative complaint and other formal submissions in enforcement proceedings to avoid administrative and judicial review of TSA's position, is arbitrary, capricious, in bad faith and contrary to law.

96.     Such a practice is also capable of repetition yet may evade review, as demonstrated by TSA's continued insistence on the non-existent requirement that TSA must recognize a country's security program in order for the security directive exemption from full direct physical screening of cargo to be available to an all-cargo aircraft operator in that country, in inspections of Amerijet operations conducted after the repudiation by TSA in a formal enforcement proceeding of that putative requirement.

97.     Based upon the suggestion that TSA has granted alternate procedures to Amerijet's competitors in locations served by Amerijet but has repeatedly denied and/or failed to grant such alternate procedures to Amerijet, Amerijet reasonably believes that it is intentionally being subjected to a pattern or practice of disparate treatment by TSA in violation of its equal protection rights under the Fifth Amendment to the United States Constitution.

98.     Subjecting Amerijet to a non-existent prerequisite to application of exemption provisions of the security directive, and then repudiating that prerequisite upon initiation of formal enforcement proceedings as a means of avoiding administrative and judicial review of TSA's actions, violates Amerijet's due process rights under the Fifth Amendment to the United States Constitution.

99.     The facts alleged herein, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  The dispute between Amerijet and Defendants is

definite and concrete, and it calls for specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

100.    Amerijet has standing because it has suffered injury in fact and there further is a reasonable probability of suffering tangible harm in the future.

## CLAIMS FOR RELIEF

### Count I
### Fifth Amendment to the U.S. Constitution

101.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 100 of this Complaint, as if fully set forth herein.

102.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law."

103.    Plaintiff has constitutionally protected interests in, *inter alia*, the economic viability of its operations.

104.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of substantive due process, including the equal protection of the laws.

105.    As described above, the actions of TSA violate the Plaintiff's constitutionally protected rights by not assuring due process of law is provided in the situations described in this Complaint.

### Count II
### Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

106.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 100 of this Complaint, as if fully set forth herein.

107.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof".  5 U.S.C. § 702.

108.     The Administrative Procedure Act further empowers the court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or ] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" 5 U. S.C. § 706(2).

109.     The pattern and practice of conduct of the Defendants as described above constitutes unlawful action which has caused Plaintiff to suffer legal wrong reviewable by this Court under the APA, 5 U.S.C. § 706.

### Count III
### Declaratory and Injunctive Relief, 28 U.S.C. § 2201 & Fed.R.Civ.P. 65

110.     Paragraphs 1 to 100 of this Complaint are re-alleged and incorporated herein as if set forth in full.

111.     The Declaratory Judgment Act, 28 U.S.C. § 2201, grants this Court authority to declare the Plaintiff's legal rights where an actual controversy exists.

112.     Plaintiff and Defendants have adverse legal interests that are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 28 U.S. C. § 2201.

113.     For the reasons stated above, Plaintiff is entitled to a declaration of its rights.

114.     A failure to enjoin Defendants' unconstitutional and unlawful conduct has and will continue to cause Plaintiff to suffer injury in that it will result in the deprivation of its Fifth Amendment Due Process rights and its protections against agency action that is arbitrary, capricious, in bad faith, or contrary to law.

115.     No adequate remedy at law exists.

116.     Defendants' unconstitutional and unlawful conduct will also adversely affect the interests of numerous third parties without advancing the public interest.

117.     Plaintiff is entitled to injunctive relief enjoining Defendants from continuing their unconstitutional and unlawful pattern and practice of conduct as alleged in this Complaint.

118.     Defendants have no protectable interest m the continuation of their unconstitutional and unlawful conduct.

Plaintiff prays for relief as follows.


## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiff Amerijet respectfully requests that this Court enter judgment in its favor and:

A.     Declare that Defendants have violated Plaintiff's rights under the Fifth Amendment to the U.S. Constitution;

B.     Declare that Defendants' pattern and practice conduct as set forth in this Complaint is arbitrary, capricious, in bad faith, and contrary to law;

C.     Enjoin and restrain Defendants, their agents, employees, successors, and all persons acting in concert or participating with them from enforcing, applying, or implementing (or requiring others to enforce, apply or implement) the views, positions, pattern or practices in violation of the Constitution and laws;

D.     Award Plaintiff the costs of litigation;

E.     Grant Plaintiff such other relief as may be necessary and appropriate or as the Court deems just and proper.

Dated:  September 16, 2013

Respectfully submitted,

Joan M. Canny, Esq.
D.C. Bar No. 425153
AMERIJET INTERNATIONAL, INC.
2800 South Andrews Avenue
Fort Lauderdale, FL  33316
Telephone:     (954) 320-5367
jcanny@amerijet.com

*/s/  Joan M. Canny*
*Attorney for Plaintiff*
*Amerijet International, Inc.*